UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DIANNA ELDER,             )
                             )
     Plaintiff,        )
                             )
     v.                   )       CAUSE NO. 3:05-CV-651 AS
                             )
SOCIAL SECURITY      )
ADMINISTRATION,      )
                             )
     Defendant.

## REPORT AND RECOMMENDATION

On October 14, 2005, Plaintiff Dianna Elder (Elder) filed her complaint in this Court. On February 2, 2006, Elder filed an opening brief and asks this Court to enter judgment in her favor or to remand this matter to the Commissioner. On April 17, 2006, Defendant Social Security Administration filed its response brief. On May 2, 2006, Elder filed her reply brief. On July 17, 2006, this matter was referred to the undersigned to conduct such proceedings as necessary to enter a report and recommendation. The following Report and Recommendation is based upon the record of this case that includes the pleadings, the motions, the administrative record, briefs of the parties, and the arguments of counsel.

## I.   PROCEDURAL BACKGROUND

On November 8, 1999, Elder filed an application for Supplemental Security Income payments. (Tr. 24). On November 29, 1999, Elder filed her application for disability insurance benefits. (Id.). Elder is insured for disability insurance benefits through June 30, 2004. (Tr. 25, 102). Elder claims she is entitled to benefits pursuant to Titles II and XVI of the Social Security Act. See 42 U.S.C. §§ 416(I), 423, 1381a. (Tr. 25, 97-99, 104-23, 313-14).

On April 17, 2002, an Administrative Law Judge (ALJ) held a hearing. (Tr. 43). On April 23, 2002, the ALJ denied Elder's claims. (Tr. 24, 43-48). However, on May 23, 2003, the Appeals Council vacated the original decision and remanded the case. (Tr. 24, 86-89).

Upon remand, on March 4, 2004, a different ALJ held a second hearing. (Tr. 24, 326-375). The ALJ found that Elder had not engaged in substantial, gainful activity since the alleged onset of the disability, and the ALJ found that Elder's problems were severe. (Tr 33-34). Further, even though Elder's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. app. 1, subpart P, § 404, the ALJ found that Elder was unable to perform any of her past relevant work. (Tr. 34). However, the ALJ found that Elder had a residual functional capacity that allowed her to perform a significant range of light work, and that there were a significant number of jobs in the national economy that she could perform pursuant to Medical-Vocational Rule 202.21. (Id.). As a result, Elder was not disabled as defined in the Social Security Act. (Id.).

Elder appealed the ALJ's decision to the Appeals Council. (Tr. 10-13). The Appeals Council denied review, and as a result, the ALJ's decision became the Commissioner's final decision. (Tr. 7-9); 20 C.F.R. § 404.981; Fast v. Barnhart, 397 F.3d 468, 470 (7th Cir. 2005). Consequently, on October 14, 2005, Elder filed a complaint in this Court seeking a review of the ALJ's decision. This Court may enter a report and recommendation in this matter based on its referral order, 28 U.S.C. § 636(b)(1)(B), and 42 U.S.C. § 405(g).

II.    ANALYSIS

A.    Facts

Elder, at the time the Appeal's Council denied to review the ALJ's decision, was a forty (40) year old with a high school education. (Tr. 97). From 1988 to 1998, she spent time in a factory as a mold operator and bench assembler. (Tr. 106). On August 12, 1998, Elder claims she became disabled. (Tr. 97).

On August 13, 1998, Elder had her first of many physician visits. (Tr. 186). Elder first met with her regular physician, James Hanus, MD, (Dr. Hanus). (Id.). Dr. Hanus indicated that Elder complained of hurting in her joints, and that she was having a lot of cramping and pain in her legs. (Id.). Dr. Hanus diagnosed her with fibromyalgia[1] and kept her off work until August, 17, 1998. (Tr. 148). On August 18, Dr. Hanus obtained an appointment for Elder to see Dr. Steven Ko (Dr. Ko), a rheumatologist.[2] (Tr. 186).

1.   Dr. Ko

On September 4, 1998, Elder met with Dr. Ko for a rheumatology consultation. (Tr. 174). Dr. Ko indicated that Elder suffered from pain in the hip area after about ten minutes of walking. (Id.). Further, Elder had some achiness in her arms from stirring, cooking, and other similar activities. (Id.). She was very tense all over and had begun feeling very groggy and tired in the two months prior to her visit with Dr. Ko, and she had difficulty grasping small objects, working, engaging in sexual activity or leisure activity, walking, climbing stairs, sitting down or standing up, reaching behind her back or head, sleeping, eating, dressing herself, bathing, or getting along with family members. (Tr. 174-76). Elder reported to Dr. Ko that she did most of

---

[1]Fibromyalgia is a common syndrome of chronic widespread soft tissue pain accompanied by weakness, fatigue, and sleep disturbances, the cause of which is unknown. Stedman's Medical Dictionary 725 (28th ed. 2006).

[2]A rheumatologist is a specialist in rheamatism, an indefinite term dealing with various conditions with pain of articular origin or related to other elements of the muskuloskeletal system. Stedman's Mediciel Dictionary 1689.

the housework and shopping.  (Tr. 175).  Even though Elder reported to Dr. Ko that the hardest

thing for her was to move around or stand in one place for very long, on a functional scale from

1 to 5, Elder reported a 3, which is okay.  (Id.).  Dr. Ko indicated that Elder had full range of

motion with her spine, shoulders, elbows, hips, knees, ankles, and wrists with no evidence of

synovitis,[3] limitation, or significant tenderness.  (Tr. 177).  Dr. Ko also indicated Elder had

several tender points throughout her body.  (Id.).  With regards to Elder's fibromyalgia, Dr. Ko

found it to be slightly atypical because she also had tender points at control points, which may

suggest either psychiatric disorder or somatoform disorder.[4]  (Tr. 178).  Finally, Dr. Ko excused

Elder from work and recommended that she do water exercises, take various medications,  and

report back in four weeks.  (Tr. 148, 178).

On October 5, 1998, Elder again met with Dr. Ko.  (Tr. 171).  Dr. Ko indicated that Elder

had no significant change in her symptoms, and her overall pain from a scale of 1 to 10 was a 10.

(Id.).  Elder indicated she was able to walk about 10 blocks.  (Id.).  Dr. Ko indicated a slight

decrease in Elder's tender points compared to the last visit, but that Elder was still very active.

(Id.).  Dr. Ko listed his impression as Elder having severe fibromyalgia, and Elder was put on

continuing disability and excused from work till her next visit.  (Tr. 147, 171).

From October 26, 1998, to August 10, 1999, Elder met with Dr. Ko several more times.

(Tr. 159-63, 165,169).  On October 26, 1998, Dr. Ko found that Elder had 18 of 18 ACR[5] criteria

---

[3]Synovitis is an inflamation of a synovial membrane, especially that of a joint.  Stedman's Medicial
Dictionary 1920.

[4] Somatoform disorder is a disorder where physical symptoms suggesting physical disorder for which there
are no demonstrable organic findings or known physiologic mechanisms and for which there is no positive evidence,
or a strong presumption that the symptoms are linked to psychological factors.  Stedman's Medicial Dictionary 571.

[5]"ACR" is an abbreviation for the American College of Radiology.  Stedman's Medicial Dictionary 17.

tender points in a mild to moderate intensity, she was only able to walk three or four blocks

instead of ten, and her fibromyalgia was ongoing with flare ups.[6]  (Tr. 169).  On November 24,

1998, Dr. Ko found Elder met only 14 of the 18 ACR criteria, that her fibromyalgia was ongoing

with some improvement, she was undergoing water exercise, and she was able to walk a mile

and a half.  (Tr. 165).  On December 29, 1998, and January 25, 1999, Elder had several tender

points and her fibromyalgia was still significantly flared.  (Tr. 162-63).  On March 26, 1999,

Elder stated that she had been exercising.  (Tr. 161).  Dr. Ko noted that Elder had been persistent

about asking for a work excuse.  (Id.).  As a result, Dr. Ko indicated that he wondered if there

were some secondary issues, which was further evidenced by the fact that her fibromyalgia

symptoms were not getting any better.  (Id.).  On June 3, 1999, Dr. Ko indicated that Elder,

again, sought a complete excuse from work, and Dr. Ko asked her to obtain a functional capacity

evaluation from another medical practitioner.  (Tr. 160).  Dr. Ko believed she could probably go

back to work part-time following that evaluation.  (Id.).  On August 10, 1999, Dr. Ko met for the

final time with Elder.  (Tr. 159).  Dr. Ko indicated that Elder was walking a mile daily and that

he believed Elder had reached the maximum benefits of treatment.  (Id.).  Elder had not obtained

the functional capacity evaluation.  (Id.).  Dr. Ko strongly recommended to Elder to look into

alternative work.  (Id.).

      2.   Dr. Hanus

On August 24, 1999, Elder again began receiving regular treatment from Dr. Hanus.  (Tr.

180).  Dr. Hanus indicated that Elder received an excuse from work every two months, and Dr.

---

[6] With the ACR criteria, "[d]igital palpation should be performed with a moderate degree of pressure.  For a tender point to be considered positive, the subject must state that the palpation was painful."  Harrison Principals of Internal Medicine Volume II 2056 (16th ed. 2005).

Hanus continued to provide Elder with her excuse slips.  (Id.).  Dr. Hanus also indicated that Elder did not plan on working due to her fibromyalgia.  (Id.).

Elder continued to see Dr. Hanus periodically from October 24, 1999, to February 9, 2004.  (Tr. 179, 251-59, 286-306).  Elder consistently continued to have pain and problems with her fibromyalgia with several tender points, and she occasionally sought treatment for other sicknesses and complications with her diabetes, such as high blood sugar.  (Id.).  Dr. Hanus also continued to provide her with work excuse slips.  (Id.).  At all times, Elder weighed around or over 300 pounds.  (Id.).  Dr. Hanus explained what symptoms or problems Elder was having, what medications or medical shots she was given, and general treatments, but he did not provide a detailed explanation of his examinations or the tests he performed upon Elder specifically with regards to her fibromyalgia.  (Id.).  Most of the entries regarding Elder's fibromyalgia simply indicate that Elder was in pain, where she was in pain, and that the pain appears to be caused by her fibromyalgia or weight.  (Id.).

On May 24, 2001, Dr. Hanus completed a medical source statement of ability to do work related activities.  (Tr. 233).  Dr. Hanus indicated that Elder was able to occasionally lift less than ten pounds, and that she could only stand or walk for two hours a day.  (Id.).  He indicated that her reaching, handling, fingering, and feeling were occasionally limited.  (Tr. 234).  He also indicated that her seeing, hearing, and speaking were limited.  (Id.).  Dr. Hanus found that Elder could sit no more than six hours a day and that her pushing and pulling were affected.  (Tr. 235).  Furthermore, she was occasionally limited with her climbing, balancing, kneeling, crouching, crawling, and stooping.  (Id.).  Finally, he indicated that Elder suffered from environmental limitations.  (Tr. 236).

6

Of all Elder's visits with Dr. Hanus, the most significant visits come on or about October 11, 2001, and September 28, 2003. On October 11, 2001, Dr. Hanus indicated that Elder had one of the worst cases of fibromyalgia he had ever seen and, in his opinion, she was disabled. (Tr. 263). On September 28, 2003, Elder reported that she was depressed and Dr. Hanus diagnosed her with depression. (Tr. 288).

On March 2, 2004, Dr. Hanus completed a fibromyalgia residual functional capacity questionnaire. (Tr. 307). Dr. Hanus indicated that Elder also suffered from diabetes and depression, which made her fibromyalgia worse. (Tr. 307-08). On a scale of 1 to 10, her pain was in the 7 to 9 range. (Tr. 309). With regards to work, in Dr. Hanus's opinion, Elder's pain and symptoms would frequently interfere with her attention and concentration, make her incapable of even low stress jobs, require her to take frequent ten minute breaks, and require a job that permits shifting positions at will from sitting, standing, or walking. (Tr. 308-10). Elder was able to walk one city block, could only sit for twenty minutes and stand for fifteen minutes. (Tr. 309). Finally, Dr. Hanus found that Elder's movement was limited in that she had significant limitations with reaching, handling, or fingering, and that she could only grasp, turn, twist, manipulate, or reach overhead with her hands and fingers twenty percent of the time while working an eight hour work day. (Tr. 310).

Besides her regular doctors of Dr. Ko and Dr. Hanus, Elder was evaluated by other consulting doctors after she filed her claim for disability benefits.

### 3.    Michael Holton, M.D. (Dr. Holton)

On February 25, 2000, Dr. Holton performed a consultive examination on Elder. (Tr. 197). Dr. Holton confirmed that Elder had a history of fibromyalgia with multiple tender trigger

points.  (Tr. 197-98).  He indicated that Elder stated she could walk two to three blocks or up one

flight of stairs leisurely.  (197-98).  Dr. Holton found that Elder had moderate stiffness and

halting features while standing up or sitting down, no perceived difficulty walking, and that her

range of motion was characterized by moderate generalized stiffness.  (Id.).  Her muscular

strength and tone were normal and given a rating of five out of five in all four extremities, and

her fine finger manipulative abilities appear normal with grip strength of twenty five pounds.

(Tr. 198).  Deep tendon reflexes were diminished throughout her extremities to minus two except

her ankle jerks, which were bilaterally absent.   (Id.).

    4.  Kenneth Bundza, Ph.D. (Dr. Bundza)

   On October 15, 2003, Dr. Bundza completed a mental status examination of Elder.  (Tr.

265).  Elder reported periodic crying and bouts of depression.  (Id.).  Elder's sister was present

for most of the examination and represented that Elder's depression was more severe than she

was indicating.  (Id.).  Under the Minnesota Multiphasic Personality Inventory-II (MMPI-II), Dr.

Bundza found Elder produced a 1 - 3/3 -1 profile, which is quite common.  (Tr. 267).  Further,

the results indicate the presence of significant depression with a typical array of symptoms with

the focus being health concerns.  (Id.).  Elder had elevated scores on two MMPI-II

supplementary scales sensitive to post traumatic stress disorder, but Dr. Bundza did not explore

this during the course of the interview.  (Tr. 268).  Overall, Dr. Bundza found Elder was

functioning well within the average range of intelligence and was capable of managing her own

funds.  (Id.).   Further, Elder's MMPI-II results confirmed the presence of depression, and Dr.

Bundza diagnosed her with depressive disorder.  (Id.).

    5.  Bhupendra Shah, M.D. (Dr. Shah)

8

On October 16, 2003, Dr. Shah performed a consultive examination and completed a medical source statement of ability to do work related activities.  (Tr. 282-84).  Dr. Shah stated that Elder has a history of fibromyalgia, but her neurological examination was unremarkable.  (Tr. 279).  Dr. Shah found that Elder could occasionally lift twenty five pounds, and that she could frequently lift twenty pounds.  (Tr. 281).  Further, Elder did not have standing, sitting, walking, pushing, or pulling impairments.  (Tr. 281-82).  Dr. Shah found that Elder occasionally had climbing, crawling, and stooping limitations within an eight hour work day, but he found Elder frequently was limited with her balancing, kneeling, and crouching within an eight hour work day.  (Tr. 282).  Finally, Dr. Shah found that Elder was not limited in her ability to reach, handle, finger, feel, see, hear or speak.  (Tr. 283).

6.     Hearing Testimony

At the hearing, the ALJ also heard live testimony from Elder, her mother, and a vocational expert.[7]  Elder testified that on a good day she did some minor household chores and took care of her own hygiene, but on a bad day she could only go to the bathroom.  (Tr. 359).  Also, she stated that she had hand problems at times with stirring, lifting, or clinching.  (Tr. 362).  Elder stated she did not complete the water exercises that Dr. Ko instructed her to do.  (Tr. 361).  However, Elder testified that her physical condition depressed her, and that she was in intense pain with regards to her fibromyalgia flare ups.  (Tr. 362-365).

Elder's mother testified to similar matters.  (Tr. 366-68).  She testified that Elder was in pain frequently, and as a result, she was not very active.  (Id.).  Elder's mother testified that

---

[7]At a previous hearing on October 17, 2001, the ALJ also heard testimony from Elder's husband.  (Tr. 347-350).  His testimony was very similar to that of Elder in that he indicated she was in pain, especially when she had flare ups, that she often had flare ups, and did house chores occasionally.  (Id.).

Elder would only get out of bed to go to the bathrooms on bad days, and she testified Elder had bad days half of the time.  (Tr. 366-67).

The vocational expert Dr. R. Barkhaus (VE) testified that a person that can lift or carry twenty pounds, walk for extended periods of up to a mile and a half, frequently need to sit or stand, not be able to perform work requiring closely regimented pace and production, and determine his or her own pace of work could perform the jobs of office helper, maid or cleaner, or cashier.  (Tr. 369-70).  Further, he testified that approximately three hundred such jobs were available in the area, which was approximately sixty five miles from Elder's home.  (Tr. 370).  However, the VE testified that if one were significantly limited with reaching, handling, and fingering, he or she could not do any sedentary light work, including cashier, maid, or office worker.  (Tr. 372-73).  Further, if a person were forced to miss work consistently once per week, or 4 times per month, he or she would be excluded from any competitive employment.  (Tr. 374).

B.      Standard of Review

The standard of review for an ALJ's decision is whether it is supported by substantial evidence and free of legal error.  See 42 U.S.C § 405(g); Briscoe v. Barnhart, 425 F.3d 345, 351 (7th Cir. 2005); Haynes v. Barnhart, 416 F.3d 621, 626 (7th Cir. 2005); Golembiewski v. Barnhardt, 322 F.3d 912, 915 (7th Cir. 2003).  Substantial evidence is more than a scintilla and means such relevant evidence as a reasonable mind might accept to support such a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1972).  A reviewing court is not to substitute its own opinion for that of the ALJ's or to re-weigh the evidence, but the ALJ must build a logical bridge from the evidence to his conclusion.  Haynes, 416 F.3d at 626.  An ALJ decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues.  Lopez v. Barnhart, 336 F.3d

535, 539 (7th Cir. 2003).  However, an ALJ's legal conclusions are reviewed *de novo*.  Haynes,

416 F.3d at 626.

       C.    <u>Elder's Motion for Summary Judgment or Remand</u>

       To be entitled to benefits under 42 U.S.C. §§ 423, 1321a, Elder must establish that she

was "disabled."  <u>See</u> 42 U.S.C. § 423(a)(1)(D).  The Social Security Act defines "disability" as:

> inability to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in death or
> which has lasted or can be expected to last for a continuous period of not less than 12
> months.

42 U.S.C. § 423(d)(1)(A).  The Social Security regulations prescribe a sequential five-part test

for determining whether a claimant is disabled.  The ALJ must consider whether: 1) the claimant

is presently employed; 2) the claimant has a severe impairment or combination of impairments,

3) the claimant's impairment meets or equals any impairment listed in the regulations as being so

severe as to preclude substantial gainful activity, 4) the claimant's residual functional capacity

leaves him unable to perform his past relevant work, and 5) the claimant is unable to perform

any other work existing in significant numbers in the national economy.  20 C.F.R. §§

404.1520(a)(4)(i)-(v), 416.920; <u>Briscoe</u>, 425 F.3d at 352.  If the ALJ finds that the claimant is

disabled or not disabled at any step, he may make his determination without evaluating the

remaining steps.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  If there is an affirmative answer

at either step three or step five, then there is a finding of disability.  <u>Briscoe</u>, 425 F.3d at 352.  At

step three, if the impairment meets any of the severe impairments listed in the regulations, the

impairment is acknowledged by the Commissioner.  <u>See</u> 20 C.F.R. § 404.1520(a)(4)(iii); 20

C.F.R. app. 1, subpart P, § 404.  However, if the impairment is not so listed, the ALJ assesses the

claimant's residual functional capacity, which in turn is used to determine whether the claimant

can perform her past work under step four and whether the claimant can perform other work in society under step five.  20 C.F.R. § 404.1520(e).  The claimant bears the burden of proof on steps one through four, but the burden shifts to the Commissioner at step five.  Id.

The ALJ found that the claimant's residual functional capacity allowed her to perform other work that existed in significant numbers in the national economy at step five.  As a result, she was not disabled.  Elder asserts three arguments attacking the ALJ's assessment of Elder's case.  First, Elder contends that the ALJ failed to give the appropriate amount of deference to the opinions of her treating physicians.   Second, Elder contends the ALJ failed to properly address and consider the lay witness testimony.  Finally, she contends that the ALJ improperly evaluated her credibility.

> 1.    The ALJ's determinations that the opinions of Elder's treating physicians were not controlling is supported by substantial evidence

Elder contends that the ALJ erred by not assigning more evidentiary weight to the opinions of her treating physicians, Dr. Ko and Dr. Hanus.  An ALJ is to give a treating physician's opinion controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record.  Hofslien v. Barnhart, 439 F.3d 375, 376 (7th Cir. 2006).  "This rule . . . seems to take back with one hand what it gives with the other, and as a result to provide little in the way of guidance to either ."  Id. More weight is generally given to the opinion of a treating physician because he is more familiar with the claimant's conditions and circumstances. 20 C.F.R. § 404.1527(d)(2);  Clifford v. Apfel, 227 F.3d 863, 870 (7th Cir. 2000).  However, a claimant is not entitled to benefits merely because a treating physician labels her as disabled.  Dixon, 270

F.3d at 1177.   Medical evidence may be discounted if it is internally inconsistent or inconsistent

with other evidence in the record.  Clifford, 227 F.3d at 870.  However, the ALJ must avoid

substituting his own opinion for that of the treating physician without relying on medical

evidence or authority in the record.  20 C.F.R. § 404.1527(d)(2); Clifford, 227 F.3d at 870;

Rohan, 98 F.3d at 968.  When evidence in opposition to the presumption is introduced, the rule

drops out and the treating physician's evidence is just one more piece of evidence for the ALJ to

weigh.  Hofslien, 439 F.3d.at 377 (citations omitted).  Unfortunately, there is no bright line for

when a physician's opinion is inconsistent with other substantial evidence in the record, and it is

essentially a case by case determination depending on the circumstances.  Id.

> a.   Dr. Ko

The ALJ was troubled with the inconsistent statements by Dr. Ko.  (Id.).  In Dr. Ko's

work statements, Dr. Ko recommended Elder should seek vocational rehab, get help finding an

alternate job, and that in his opinion she could probably go back to work part time.  (Tr. 27, 160).

However, in Dr. Ko's off-work statements, he stated that Elder could not work and he provided

her with work excuse slips.  (Tr. 28, 146-48).  The ALJ concluded these inconsistences

warranted that Dr. Ko's opinion that Elder had no capacity for work, should be given less

weight.  (Id.).

Elder contends that the ALJ committed error because he did not assign more weight to

the opinions of Dr. Ko.  Elder asserts that Dr. Ko's opinions are not inconsistent because he

recommends that Elder could return to work "part-time." Elder argues that the ALJ selectively

chose not to discuss the "part time" statement.  Elder argues that one who works "part-time" is

still disabled under Social Security ruling 96-8p, and that if the ALJ would have considered the

"part-time" statement by Dr. Ko, the ALJ would have to reason that Dr. Ko was still in fact stating Elder was disabled.

Whatever determination one who works "part-time" in the legal context of SSR 96-8p has upon the ultimate determination of disability is irrelevant. The important fact is that Dr. Ko appears to be questioning Elder's disability, and his finding that she could work "part time" is not consistent with having "no capacity for work." Despite what Social Security Ruling 96-8p says about one who can only work part time, medical evidence may be discounted if it is internally inconsistent. Clifford, 227 F.3d at 870. The ALJ adequately explained that Dr. Ko's inconsistencies were the reason for assigning little weight to Dr. Ko, and he referred to specific parts of Dr. Ko's opinions as evidence that inconsistencies existed to support his conclusion. This Court cannot say this decision was not reasonable.

Furthermore, this Court notes that the objective evidence not cited by the ALJ supports this determination. The records of Dr. Ko suggest that he became more skeptical of Elder's claims of disability over the course of his treatment. (Tr. 159-161). Dr. Ko at one point even opined whether secondary issues existed because she was persistent about receiving a work excuse and because her symptoms were not getting better. (Tr. 161). Eventually, Dr. Ko even terminates treatment because he believes Elder has reached the maximum benefits of his treatment. (Tr. 159). The objective evidence is not clearly contrary to the ALJ's determination. The ALJ's decision was reasonable and supported by substantial evidence.

b.    Dr. Hanus

With regards to Dr. Hanus, the ALJ was troubled because Dr. Hanus's reports did not detail that he performed a thorough corroborating exam with Elder's fibromyalgia. (Id.).

14

Instead, most of Dr. Hanus's reports dealt with Elder's seasonal needs rather than her systemic needs.  (Id.)  His treatment did not address her as if she had a debilitating illness but instead only mild pain and fatigue.  (Id.).  Dr. Hanus's reports of Elder's capacity were not supported by examinations that reflected the details of his reports of disability.  (Id.).  Finally, the ALJ indicated that Dr. Hanus was not a specialist but only a family practitioner.  (Id.).  As a result, the ALJ did not give substantial weight to the evidence regarding Dr. Hanus.

Elder, again, contends that the ALJ selectively evaluated the evidence.  Elder contends that Dr. Hanus's records are replete with accounts of Dr. Hanus providing Elder with injections and prescribing strong medications for her pain.  Elder contends that these treatments indicate Dr. Hanus was treating Elder for more than mild pain and fatigue.

An ALJ is to consider the length of the treatment relationship and frequency of examination, extent of the treatment relationship, supportability through medical signs and medical findings, consistency, specialization, and any other factors.  20 C.F.R. § 404.1527(d)(1)-(6).  The better an explanation a source provides for an opinion, the more weight an opinion will be given.  20 C.F.R. § 404.1527(d)(3).  Contrary to Elder's contention, it does not appear the ALJ selectively evaluated the evidence.  The ALJ indicated that Dr. Hanus did not detail how or if he performed any thorough corroborating exams to support his medical findings, and based on the reports of Dr. Hanus, it appears the ALJ is correct.  Dr. Hanus, at best, merely records Elder's complaints of pain.  Dr. Hanus does not indicate what he did to verify those complaints.  Dr. Hanus provided Elder with drugs and injections to treat her pain, but treatment of pain by itself does not explain how Dr. Hanus arrived at a determination that Elder was in pain.  The ALJ reasonably explained that Dr. Hanus's explanations were subpar, his treatments of Elder were

15

inconsistent with his claims she that was disabled, and that he was not a specialist.  There does not appear to be any evidence in the record that the ALJ failed to consider that suggests his conclusion was wrong or his analysis incomplete. The few objective tests that Dr. Hanus did do, x-rays and a reflex check, do no support any claims that Elder was in any sort of pain.  (Tr. 305). As a consequence, the ALJ reasonably found Dr. Hanus's opinions that Elder was disabled were inconsistent with his recitation of treatment.  This Court cannot say that the ALJ's analysis was not reasonable and supported by substantial evidence.

### c.    Dr. Bundza

Elder also asserts that the ALJ impermissibly "played doctor" by substituting his opinion for Dr. Bundza's when the ALJ analyzed the MMPI-II results.  The MMPI-II has graph like results based on a claimant's answers to a written exam.  A psychologist or other trained professional interprets those graph results to assess various characteristics of the claimant.  One of those characteristics is credibility.  Dr. Bundza indicated that Elder may have become distracted with answering questions in the later part of the test, and he indicates her overall results appear reasonably valid and essentially consistent with her clinical presentation.  (Tr. 30, 267).  The ALJ also examined the MMPI-II charts and found  "[t]he claimant's score on the MMPI includes significantly high scores on the F scale.  Generally, a high score on the F scale implies an unusual test-taking attitude and apparent deviant responses." (Tr. 30).  Elder asserts that when the ALJ made this commentary, he impermissibly "played doctor" and substituted his opinion for Dr. Bundza's.

While the ALJ comments on the MMPI-II results, he does not substitute an opinion for Dr. Bundza that Elder was not depressed.  In fact, the ALJ relies on Dr. Bundza's assessment

that Elder was depressed.  The ALJ states, "[t]he medical evidence raises the issue that mental impairment(s) affects the claimant's behavior and responses during examinations.  Thus, the psychological factors in the claimant's capacity for work must be assessed." (Tr. 30).   The ALJ then goes on to evaluate Elder under the B and C criteria of  20 C.F.R. § 12.04, app. 1, subpart P, § 404 because Dr. Bundza, specifically, confirmed the presence of depression.  At no time does the ALJ substitute his opinion for Dr. Bundza's.[8]

Finally, Elder generally asserts that the ALJ failed to consider her depression in conjunction with her other ailments.  Elder is correct that an ALJ is required to consider the totality of a claimant's impairments.  Mendez v. Barnhart, 439 F.3d 360, 363 (7th Cir. 2006).  A general examination of the ALJ's decision reveals that the ALJ explicitly analyzed Elder's depression in conjunction with her other ailments because he analyzes all of Elder's problems together when determining her residual functional capacity.  (Tr. 29-30).  But Elder's specific argument is that Dr. Hanus found depression enhanced Elder's other symptoms, and that the ALJ committed error because he did not consider Dr. Hanus's statement that Elder's depression affected her other symptoms.  Elder's argument hinges on evidence presented by a source, Dr. Hanus, that the ALJ found to have little weight.  Elder has not presented, nor has this Court found in the record, any other evidence that suggests Elder's other problems worsened drastically because of her depression.  Elder had the burden of presenting sufficient evidence that

---

[8]Elder also asserts that she was deprived her procedural due process because the ALJ interpreted the MMPI-II results.  Even though Elder has some property rights in her disability benefits, this Court does not agree that Elder was denied her procedural due process.  It is fundamental that the affected party must be granted the right to notice and an opportunity to be heard at a meaningful time and in a meaningful manner.  Fuentes v. Shevin, 407 U.S. 67, 80 (1983); U.S. v. James Daniel Good Real Property, 510 U.S. 43, 55 (1993).  In the present case, Elder participated in a hearing before an ALJ, she presented evidence, and she presented her arguments prior to the deprivation of her disability benefits.  Further, the fact that Elder participated in the hearing necessarily implies that she received adequate notice.  Elder's property interest in her disability benefits require no more process than this.  See Mathews v. Eldridge, 424 U.S. 319, 349 (1976); Conn. v. Dohr, 501 U.S. 1, 11 (1991) (citations omitted).

her depression worsened her other ailments, but she failed to do so.  Consequently, so far as Elder argues the ALJ failed to decline Dr. Hanus's specific allegation, because the ALJ assigned little weight to Dr. Hanus's opinions and because there was no other evidence that supported Dr. Hanus's supposition, the ALJ properly declined to address Dr. Hanus's specific statement.  The ALJ properly considered the totality of Elder's disability.

Simply put, the ALJ's decision to attribute limited weight to Elder's physicians was supported by substantial evidence, the ALJ did not substitute his opinion for the physicians' opinions, and the ALJ considered the totality of Elder's impairments.  Elder's next argument is that the ALJ failed to consider the evidence of lay witnesses.

2.   The ALJ's discounting of the testimony of the lay witnesses is supported by substantial evidence

Elder's second contention is that the ALJ failed to consider the testimony of her mother and husband.  When a witness's testimony does not constitute a separate line of evidence and merely reiterates and corroborates the claimant's testimony, an ALJ does not need to address it. See Books v. Chater, 91 F.3d 972, 980 (7th Cir. 1996); Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir. 1993).  An ALJ does not need to address every piece of evidence.  Books, 91 F.3d at 980.  The ALJ merely needs to articulate his assessment to assure this Court that he considered the most important evidence so that the ALJ's reasoning can be traced.  Id.

In the present case, the ALJ said nothing about the testimony of Elder's husband and very little about the testimony of Elder's mother.  Elder contends this is error.  However, the testimony of Elder's husband and mother does not present a new line of evidence.  Elder's husband testified that she did not move around much, she did some house chores, some cooking,

she had painful flare-ups with her fibormyalgia, and that she tended to cry a lot.  (Tr. 348-349).

Elder's mother testified that Elder was in pain most of the time, that she did a few chores around

the house, and that three of the seven days out of the week she basically did nothing.  (Tr. 366-

68).  The reports and records of Dr. Ko and Dr. Hanus, as well as the testimony of Elder herself,

reiterate the same or very similar facts.  Nothing in the testimony of Elder's husband or mother is

different from other evidence in the record so as to constitute a new line of evidence.  There is

nothing in the testimony of Elder's husband or mother that makes this Court question the ALJ's

reasoning, or to persuade it that the ALJ failed to consider the most important evidence.

Elder contends that the ALJ's analysis of the testimony of Elder's mother violated

Behymer v. Apfel, 45 F.Supp 2d. 654, 663 (N.D. Ind. 1999) and 20 C.F.R. § 404.1529(c)(3).[9]

Behymer indicated that an ALJ must provide an explanation for discounting a lay witnesses's

testimony, and that explanation must contain more than a statement that the witness is biased

because that witness is a family member.  45 F.Supp. 2d. at 663-64.  Behymer does not stand for

the proposition that bias cannot be a consideration, it simply provides that family member bias

cannot be the only consideration.  Id.  The ALJ explained that the testimony of Elder's mother

lacked evidentiary weight because she was a close relative, and possibly a biased witness as a

consequence, *and* because she was not a medical professional.  (Tr. 27).  This explanation,

especially when combined with the fact that the ALJ did not even need to consider the evidence

of Elder's mother when it was redundant of evidence in the record, satisfies Behymer.

---

[9]20 C.F.R. § 404.1529(c)(3) provides in part, "we will carefully consider any other information you may submit about your symptoms.  The information that you, . . . or other persons provide about your pain or other symptoms. . . . Because symptoms, such as pain, are subjective . . . any symptom-related functional limitations . . . which can reasonably be accepted as consistent with objective medical evidence and other evidence, will be taken into account."

In sum, the testimony of Elder's husband and mother corroborated other evidence in the record, and as a result, the ALJ's decision to assign little weight to such testimony was supported by substantial evidence.  Elder's only remaining argument is whether the ALJ impermissibly evaluated Elder's credibility.

> 3.    The ALJ's determination of Elder's credibility was supported by
>        substantial evidence

Because an ALJ is in a special position where he can hear, see, and assess witnesses, his credibility determinations are given special deference, and as a result, his credibility determinations will only be overturned if they are patently wrong.  Jens v. Barnhart, 347 F.3d 209, 213 (7th Cir. 2003).  Social Security Ruling 96-7p requires an ALJ to articulate specific reasons in a credibility finding.  Golembiewski, 322 F.3d at 915; Steele v. Barnhart, 290 F.3d 936, 942 (7th Cir. 2002).  An ALJ cannot simply state that an individual's allegations are not credible.  Golembiewski, 322 F.3d at 915.  Also, the ALJ may not simply recite the factors that are described in the regulations for evaluating symptoms.  Zurawski v Halter, 245 F.3d 881, 887 (7th Cir. 2001).  The ALJ considers any inconsistencies in the record and whether the claimant's testimony conflicts with the rest of the evidence.  20 C.F.R. § 404.1529(c)(4).  However, an ALJ is not required to provide a "complete written evaluation of every piece of testimony and evidence."  Rice v. Barnhart, 384 F.3d 363, 370 (7th Cir. 2004) (quoting Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995)).

In the present case, the ALJ gave a detailed analysis of his determination of Elder's credibility.  The ALJ found that Elder was not entirely reliable because her testimony was not consistent with her reports to Dr. Ko.  (Tr. 27).  Specifically, Dr. Ko reported that Elder said she

was participating in water exercises, walking a mile to a mile and a half per day, caring for her children, doing house chores, and that her functioning was ok despite her pain.  (Id.).  However, at the hearing Elder testified she was not walking over a mile and performing water exercises as much as Dr. Ko indicated.  (Id.).  When the ALJ confronted Elder with these inconsistencies, Elder did not provide an explanation for why or how they occurred.  (Tr. 27, 368).   The ALJ found these inconsistencies undermined Elder's credibility.  (Tr. 27, 358, 368.).  The ALJ found it less likely that Dr. Ko would misstate his findings and more likely that Elder misrepresented matters to Dr. Ko.  (Tr. 27.).  Further, the ALJ examined and based his decision on the medical evidence.  The ALJ identified an entry by Dr. Ko where he expressed Elder had tender trigger points that were not actually diagnostic of fibromyalgia, which suggested, consciously or not, that Elder was exaggerating.  (Id.).  The ALJ also found that Elder's claim for back pain was not supported by the medical evidence provided by imaging studies of her spine.  (Id.).  Finally, the ALJ indicated that Elder's MMPI-II results suggested Elder may be prone to providing deviant responses.  (Tr. 30).  Therefore, the ALJ found Elder's allegations of limitations to not be entirely reliable, and he gave them little consideration when assessing Elder's residual functional capacity.  (Tr. 27, 30.).

This Court finds the ALJ's evaluation of Elder's credibility was supported by substantial evidence.  This Court is merely required to determine whether the ALJ provided specific, reasonable analysis for his determination of Elder's credibility.  The ALJ specifically stated  the inconsistencies between Dr. Ko's medical documents and Elder's testimony and the fact that Elder could not provide an explanation for the inconsistences diminished Elder's credibility.  The ALJ even identified and described the inconsistencies.  Further, the ALJ identified some

objective medical evidence that did not support Elder's claims.  The ALJ identified the imaging studies of Elder's spine and her MMPI-II results  and he described how that evidence led him to his conclusions.  The ALJ did not simply list the factors from the regulations for evaluating symptoms.  The ALJ created a logical bridge with his credibility determination, and as a consequence, the ALJ's credibility finding was reasonable.

Elder makes several arguments attacking the ALJ's credibility determinations.  First, Elder contends that the ALJ selectively considered evidence in reaching his conclusion that Elder was not credible.   In the present case, Elder claimed that half of the days of the week, her pain was so bad she could not move.  Further, Dr. Ko and Dr. Hanus provide evidence in their reports and office notes that Elder indicated she was in pain.  Essentially, Elder contests the ALJ should have considered or discussed evidence about her pain.  At the very least, Elder asserts that the ALJ should have provided reasoning for why he did not consider her and her doctors' accounts of pain.  Elder argues that because the ALJ did not consider these matters in his analysis, he failed to discuss an entire line of evidence.

An ALJ must base his decision on all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  An ALJ does not need to provide a written analysis of every piece of evidence, but an ALJ may not fail to discuss an entire line of evidence.  Green v. Shalala, 51 F.3d 96, 101 (7th Cir. 1995).  If an ALJ finds that an allegation of pain is not supported by the objective medical evidence in the record, and if the claimant still indicates that pain is a significant factor of his or her alleged disability, then the ALJ must a obtain detailed description of the claimant's daily activities by directing specific inquires about the pain and its effects to the claimant.  Zurawski, 245 F.3d at 887.  The ALJ must investigate all avenues presented that

relate to pain, including prior work information, observations by treating physicians, observations by examining physicians, and observations by third parties.  Id.  The ALJ must consider factors of pain, precipitation and aggravating factors, dosage and effectiveness of pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities.  Id.  Where the medical signs and findings reasonably support a claimant's complaint of pain, the ALJ cannot merely ignore the claimant's allegations.  Id. at 887-88.

In the present case, the ALJ did not find Elder lacked credibility because the objective medical evidence did not support her claims.  Rather, his cornerstone finding was that Elder essentially impeached herself because her testimony contradicted the records of Dr. Ko and she was unable to explain the inconsistency.   This finding is specifically the type of finding where the ALJ is given deference because he is in a special position to see, hear, and judge the witness. See Jens 347 F.3d at 213. Still, even though the ALJ did not base his credibility determination on inconsistencies between Elder's claims of pain and the objective medical evidence, this Court might be forced to remand this matter if the medical signs and findings reasonably appeared to support Elder's claims.  However, the medical signs and findings do not support Elder's claims.

All of the objective medical evidence of Elder's pain comes from the reports of Dr. Ko and Dr. Hanus.  The ALJ, as this Court has stated, reasonably found that opinions of both Dr. Ko and Dr. Hanus are not entirely reliable.  As a consequence, the objective opinions of these doctors themselves do not allow this Court to reasonably conclude Elder was in pain.  Further, all of Dr. Ko's and Dr. Hanus's reports that Elder was in pain, came directly from Elder's mouth. The only tests performed by Dr. Ko were the ACR tests, where the doctors pushes on certain

points of the body and the patient indicates whether he or she feels pain.[10]  Such tests are prone

to malingering and are not decisive.  E.g. Sims, 442 F.3d at 538.  Essentially, the only evidence

Elder points to is that she subjectively believed she was in pain.

The problem with pain, when the only evidence is based on the subjective opinion of the

claimant, is that the ALJ must of necessity base his opinion on the credibility of the claimant to

determine if the pain actually exists.  Sims v. Barnhart, 442 F.3d 536, 537-38 (7th Cir. 2006).

The burden is upon the claimant to produce test results that are not prone to malingering.  Id.

Elder may claim that due to the nature of fibromyalgia, no objective tests exist to support her

claims.  However, other avenues of objective evidence do exist.  For example, Elder could have

had a functional capacity evaluation, which she never did.  Tr. 159 (Dr. Ko indicating that Elder

needed to obtain functional capacity evaluation).  However, Elder submitted nothing. Simply

put, there is no objective medical evidence that supports Elder's claims of pain.  The ALJ could

only reasonably determine based on Elder's credibility that her subjective complaints of pain had

little evidentiary value.  This Court has not found and Elder has not pointed to evidence in the

record that suggests otherwise.  The ALJ's determination was reasonable.

Second, Elder appears to argue that the ALJ should have given more deference to Dr.

Bundza's determinations about Elder's credibility rather than to create his own determinations

about Elder's credibility.  This Court does not agree that the ALJ even bases his credibility

determination on the MMPI-II results.  However, even if the ALJ's discussion of the MMPI-II

does question Elder's credibility, the ALJ is only required to articulate specific, reasonable

---

[10]With the ACR criteria, "[d]igital palpation should be performed with a moderate degree of pressure.  For a tender point to be considered positive, the subject must state that the palpation was painful." Harrison Principals of Internal Medicine Volume II table 315-1, 2056.  "The determination of tender points can also be subjective, on the part of both the physician and the patient, particularly when issues of compensation are pending." Id. at 2057.

analysis in a credibility finding.  <u>Golembiewski</u>, 322 F.3d at 915.   This Court has already

determined that the ALJ has provided more than a sufficient basis for establishing that Elder's

testimony lacks credibility.  Further, the ALJ's opinion is specific and reasonable with the

MMPI-II.  The ALJ referred to the medical evidence in the record to support his decision.  The

ALJ referenced the F scale from the MMPI-II results and explained that literature suggests the F

scale results should lead a person to question credibility.   While this interpretation may be

subjective, it was certainly a reasonable opinion.  The ALJ reasonably chose to give less weight

to Dr. Bundza's credibility determination.  This Court will not re-weigh the evidence.   <u>Haynes</u>,

416 F.3d at 626.  Consequently, this Court does not find that the ALJ's credibility determination

was patently wrong simply because he appears to consider MMPI-II results in his credibility

analysis.

        In sum, the ALJ's reasoning for why Elder lacked credibility was both reasonable and

specific.  The ALJ did not fail to consider an entire line of evidence when the medical signs and

findings did not support Elder's contentions.   The ALJ's decision was supported by substantial

evidence.  Judgment should be entered in favor of the Social Security Administration.

**III.   CONCLUSION**

        The ALJ's determination that Elder's physicians were not entitled to controlling weight

was supported by substantial evidence.  The ALJ's decision not to consider the evidence of the

lay witnesses was supported by substantial evidence.  And, the ALJ's analysis of the claimant's

credibility was supported by substantial evidence.  As a result, this Court **REPORTS AND**

**RECOMMENDS** that judgment should be entered in favor of the Social Security

Administration affirming the Commissioner's decision pursuant to sentence four (4) of 42 U.S.C.

§ 405(g).  The Clerk should be instructed to terminate this case.

> **NOTICE IS HEREBY GIVEN that within ten (10) days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings and/or recommendations. Fed. R. Civ. P. 72(b). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER**

**SO ORDERED.**

Dated this January 3, 2007


<u>S/Christopher A. Nuechterlein</u>
Christopher A. Nuechterlein
United States Magistrate Judge